Gloria LLAGUNO, et al.,
Plaintiffs-Appellants,

v.

Edward MINGEY, et al.,
Defendants-Appellees.

No. 83–1372.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1984.

Reargued En Banc Oct. 4, 1984.

Decided June 5, 1985.

Rick Schoenfield, Ettinger & Schoenfield, Ltd., Chicago, Ill., for plaintiffs-appellants.

Philip L. Bronstein, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER, COFFEY, and FLAUM, Circuit Judges, and PELL, Senior Circuit Judge.

POSNER, Circuit Judge.

This civil rights suit under 42 U.S.C. § 1983 charges members of the Chicago Police Department with having entered and

searched the plaintiffs' home, and seized the plaintiffs, in violation of the Fourth Amendment (held applicable to state action by virtue of the Fourteenth Amendment), which, in its first clause, guarantees "the right of the people to be secure in their persons [and] houses, ... against unreasonable searches and seizures." The jury brought in a verdict for the defendants, and the plaintiffs appealed. A panel of this court (with Judge Pell in partial dissent) held that the district judge should have directed a verdict for the plaintiffs. 739 F.2d 1186 (7th Cir.1984). The full court ordered rehearing en banc to consider the division of functions between judge and jury in a damage suit charging violations of the Fourth Amendment. Differently constituted majorities of the court have now concluded that although the trial judge was right not to grant the plaintiffs' motion for directed verdict (except with respect to the 42-hour detention of David Llaguno), he committed errors that entitle the plaintiffs to a new trial.

On a night in Chicago in 1980, two young Hispanic men committed two robberies, killed four people and wounded three others (including a policeman), and abducted a young girl. When the getaway car crashed, the police were able to shoot and capture one of the killers (Garcia, who has since been sentenced to death) and recover the girl unharmed, but the other killer escaped on foot. A check of the license-plate number showed that the car was registered to Vilma Llaguno at an address two miles from the crash site and that it had not been reported stolen. The crash occurred at North and Oakley; Vilma Llaguno's address was on Wabansia, near North Avenue but farther west than Oakley. One of the robberies had taken place between the crash site and the Llaguno residence.

Several policemen, led by Sergeant Mingey, drove to their headquarters, picked up a shotgun and a sledgehammer there, and then drove to the Llaguno home, believing that the killer who had fled from the car when it crashed may have been living at Vilma Llaguno's address, and that fleeing felons often go home. (Mingey and several other policemen in the entry party are one group of defendants; the other consists of policemen involved in the protracted detention of David Llaguno, of which more shortly.) Upon arrival Mingey banged on the front door and ordered the woman who came to the door, Gloria Llaguno, to open it. She did so, and the police rushed in with drawn guns, searched the house, rounded up the occupants (the plaintiffs in this action), and herded them into the living room. Those seized included Gloria and her husband, several of their children (including David Llaguno), and several grandchildren—a total of 10 people. (Vilma Llaguno, who is Gloria Llaguno's daughter-in-law, was not at home.) In response to questions from the police, David revealed that it was his car that had crashed, and said he had loaned it to a friend. When the police asked him who the friend was, he gave Garcia's name, according to David's testimony; according to the police, he refused to answer. They arrested him. Some of the plaintiffs testified at trial that the police threatened to shoot them, which the police denied; that the police had later come back to the house to speak to David; and that on these occasions they had entered the house without anyone's consent, which they also denied—while acknowledging having held David in custody for 42 hours after his arrest, during which time they neither charged him with a crime nor brought him before a magistrate.

While the police were at the Llaguno residence, the killer who had fled from the crash at North and Oakley was shot and killed by other policemen. He turned out to be Roger Llaguno, a son of Gloria and brother of David but not a resident of the house that the police had entered. No charges were ever lodged against any of the occupants, including David.

■ The plaintiffs argue that even if the police had probable cause to search the house and detain its occupants (an issue we shall come back to), they still violated the Fourth Amendment as a matter of law by

failing to get a search warrant. Except in an emergency ("exigent circumstances"), police may not, with neither a warrant nor the homeowner's permission, search a home even though they have probable cause to believe a search would be fruitful. See, e.g., *Welsh v. Wisconsin*, —— U.S. ——, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). But if the police in this case had probable cause to believe that the killer was in the Llaguno house, they were excused from getting a warrant, which could have imposed a delay of several hours. The situation was an emergency in about as vivid a sense as can be imagined. A man had (with his partner) just shot seven people. There was no reason to think he had finished shooting; there was every reason to think he would put up a violent resistance. If the police delayed for a warrant, the killer might barricade the house, take hostages, or flee and kill again before they could catch up with him.

■ True, other cases where an emergency has been held to justify a search without a warrant have involved a clearer showing of probable cause for the search than this case. See, e.g., *Warden v. Hayden*, 387 U.S. 294, 297–99, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782 (1967); *Dorman v. United States*, 435 F.2d 385, 393 (D.C. Cir.1970) (en banc). Yet even *Dorman*, which lists six factors to be considered in deciding whether a warrant can be dispensed with, one being a "clear showing" of probable cause, *id.* at 392–93, does not suggest that all six factors must be present in each case; and a later District of Columbia Circuit decision, written by the author of *Dorman*, makes clear that all need not be. See *United States v. Robinson*, 533 F.2d 578, 583–84 (D.C.Cir.1976) (en banc). Moreover, in *United States v. Acevedo*, 627 F.2d 68, 70 (7th Cir.1980), we cautioned against the "checklist-type analysis" of *Dorman* (see also *People v. Abney*, 81 Ill.2d 159, 173, 41 Ill.Dec. 45, 51, 407 N.E.2d 543, 549 (1980); 1 LaFave & Israel, Criminal Procedure § 3.6, at pp. 262–63 (1984); LaFave, *"Seizures" Typology: Classifying Detentions of the Person to Resolve Warrant, Grounds, and Search Issues*, 17 J.L. Reform 417, 454–58 (1984)), and said the question was simply "whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." The Fourth Amendment contains no checklist of factors constituting an emergency—contains, indeed, no reference to emergencies. The operative word in the Fourth Amendment is "unreasonable"; so the question ought to be, were the police unreasonable in not getting a warrant in the circumstances that confronted them?

■■ The greater the danger to public safety if the police delay entering premises in search of a criminal suspect, the more reason they have for not waiting; and the danger here was greater than in *Hayden*, *Dorman*, or any other case we know of in which a "clear showing" of probable cause, as distinct from a mere showing, was made. The analogy to determining reasonableness in a negligence case by comparing the danger of an accident to the burden of avoiding it, see, e.g., *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (L. Hand, J.), suggests that in determining whether police are reasonable in entering a house without a warrant the trier of fact ought to consider not only how great the risk of delay was—that is, the probability of injury, escape, or destruction of evidence, see, e.g., *United States v. Acevedo, supra*, 627 F.2d at 71—but also how great the harm would have been had the risk materialized. The greater that harm would be, the less need be the probability that it would actually have occurred to justify the police in invading the interest (great though it is) in the privacy of the home. The potential harm from waiting for a search warrant in this case was very great even though it was far from certain that an immediate search would be productive. See *United States v. Bottoson*, 644 F.2d 1174, 1176 (5th Cir.1981) (per curiam); *United States v. Jones*, 635 F.2d 1357, 1360 (8th Cir.1980); *United States v. Williams*, 612 F.2d 735, 739 (3d Cir.1979); *United*

*States v. Bustamante-Gamez,* 488 F.2d 4, 9 (9th Cir.1973).

Even so, the police could lawfully enter the Llaguno house without a warrant or the homeowner's consent only if there was probable cause to believe that the killer was in the house. Although the words "probable cause" appear only in the second clause of the Fourth Amendment, which deals with warrants, and we have said that the police did not have to get a warrant in this case, the words are also used to describe an essential ingredient of reasonableness, see, e.g., *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); and all searches and seizures must be reasonable to comply with the Fourth Amendment.

■ It is true that the issue of probable cause ordinarily is for the judge rather than the jury. That is because the issue usually arises in the context of a motion to suppress evidence, which the judge decides. But where the issue arises in a damage suit, it is, as the panel opinion acknowledged, a proper issue for the jury if there is room for a difference of opinion. See 739 F.2d at 1190; *Hindman v. City of Paris,* 746 F.2d 1063, 1067 (5th Cir.1984); *Garris v. Rowland,* 678 F.2d 1264, 1270 (5th Cir.1982); *Giordano v. Lee,* 434 F.2d 1227, 1230 (8th Cir.1970); cf. *Banish v. Locks,* 414 F.2d 638, 641 (7th Cir.1969). The underlying issue in deciding whether the police had probable cause to do what they did is reasonableness, which is also the underlying issue in deciding negligence—a classic jury issue.

■ Probable cause means, in fact, a reasonable basis—"more than bare suspicion, but less than virtual certainty," *United States v. Garza-Hernandez,* 623 F.2d 496, 499 (7th Cir.1980); see also *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 226, 13 L.Ed.2d 142 (1964); Grano, *Probable Cause and Common Sense: A Reply to the Critics of Illinois v. Gates,* 17 J.L. Reform 465, 478–512 (1984)—for believing that a search or seizure will be fruitful—will turn up evidence, or leads to evidence, or contraband, or the perpetrator of the crime. Emergency is not enough. An emergency, at least the kind of emergency, great but not apocalyptic in its menace, involved in this case, would not allow the police to search every house in Chicago or even every house on the Llagunos' block. There must be something more than suspicion—there must be reasonable grounds for believing that the search of *this* house would prove fruitful in the criminal investigation. There is considerable doubt whether this requirement was met here. An example will dramatize our concern. A man drives to work, and parks his car on the street. A thief steals it, runs down a pedestrian, and crashes the car. The police check the license, note that the car has not been reported stolen, and, inferring from this that the car was being driven by its owner when it crashed, proceed forthwith to the owner's home, sledgehammer in hand. They knock on the door and when no one answers they break it down, search the house, and arrest the owner when he returns from work. It is this kind of police excess that the plaintiffs ask us to condemn by directing a verdict for them.

■ A reasonable jury would have to find a violation of the Fourth Amendment in our hypothetical case—to which the present case bears more than a family resemblance. Even the fact that a multiple murderer is on the loose does not give the police a license to search and seize without a reasonable basis, see, e.g., *Lankford v. Gelston,* 364 F.2d 197, 198 (4th Cir.1966) (en banc); 2 LaFave, Search and Seizure § 6.1, at p. 374 (1978), though it may affect the judgment of what is reasonable. But although the present case is close to the line that separates arguably reasonable from unarguably unreasonable police behavior, it does not cross it. Probable cause—the area between bare suspicion and virtual certainty—describes not a point but a zone, within which the graver the crime the more latitude the police must be allowed. The shooting of seven persons (four fatally) by a team of criminals in the space of two hours is about as grave a crisis as a local police department will en-

counter. The police must be allowed more leeway in resolving it than when they are investigating the theft of a bicycle. Especially when a multiple murderer is at large in circumstances suggesting that he may be about to kill again, the interest in public safety is paramount.

It is true that the gravity of the crime and the threat of its imminent repetition usually are discussed in relation to the existence of an emergency justifying a search or arrest without a warrant, as we have already seen, rather than in relation to probable cause for the search or arrest. But there is some judicial recognition of the latter relation. See *United States v. Preston*, 468 F.2d 1007, 1010 (6th Cir.1972); *Nueslein v. District of Columbia*, 115 F.2d 690, 696 (D.C.Cir.1940); *Brinegar v. United States*, 338 U.S. 160, 183, 69 S.Ct. 1302, 1314, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting); cf. Grano, *supra*, 17 J.L. Reform at 503–04. The amount of information that prudent police will collect before deciding to make a search or an arrest, and hence the amount of probable cause they will have, is a function of the gravity of the crime, and especially the danger of its imminent repetition. If a multiple murderer is at large, the police must compress their investigation and make the decision to search or arrest on less information than if they could investigate at their leisure.

■ The police in this case had strong reason to believe that the killer who had fled on foot was Hispanic; and since the car had not been reported stolen and the registered owner had a Hispanic name, they had some reason to think the killer was either the owner or had been driving with the owner's permission. Although the car was registered to "Vilma" Llaguno, a woman's name—we now know—the police may not have known that Vilma is always a woman's first name (a matter on which the record is unclear); readers of Chekhov know that "Vanya" is a man's first name. Anyway, Vilma might have been the wife or sister or mother of the killer, in which event her address might have been his. And he might have sought refuge at her address (if she was a close relative) even if it was not also his, because the crash occurred on the major thoroughfare leading to the house (North Avenue), though not within easy walking distance (two miles). Of course the killer who fled on foot might not have been Vilma's relative; the record does not reveal whether the police who entered the Llaguno home knew by then the name of the killer, Garcia, who had been seized at the crash. And if the fleeing killer was not a relative it was much less likely that he would flee to the home of the car's owner. And yet we think a reasonable jury could have found that the police had a reasonable probability, based on real if inconclusive information rather than inspired hunch or a dragnet mentality, of finding the killer in (or en route to or from) the Llaguno home. As it turned out, he was not there; but that just shows that the probability he would be there was not 100 percent. The police were not completely off base. The killer was, after all, a son of the people who lived there, and he might well have fled there after the shooting spree, though in fact he did not.

Even so, it would not have been reasonable for the police to act on such limited information if they could have gotten better information first without incurring, or subjecting others to, great danger. There are several things they could have done. They could have tried to interview the occupants of the Llaguno home with the occupants' consent. They could have sealed off the house and questioned the occupants as they emerged. They could have questioned neighbors. They could have waited till Garcia had recovered enough from his wound to be questioned. But each of these alternatives was dangerous. If the killer had actually been in the house, the policemen's efforts to obtain the occupants' consent to a search could have alerted him to the presence of the police and allowed him to shoot before they could disarm him. Sealing off the house may have been difficult, because it was nighttime and the house was a detached house which would have had to be surrounded. If the killer had been there, as the police had some

reason to think he was, sealing off the house might have led him to barricade it or take some of its occupants as hostages (people sometimes take their relatives hostage). Questioning Garcia, or the neighbors, could have caused a long delay in discovering whether the suspect was inside the house.

Given the gravity of the crimes they were investigating, the possibility that there would be more shootings unless the killer was seized immediately, and the information (limited as it was) that made it seem that he might well have fled to the Llaguno home, we cannot say, as a matter of law, that the police did not have probable cause to enter and search the house as they did. And if this is right, we do not think it makes a critical difference that they had no definite suspect in mind. If the police see a killer (or for that matter some lesser felon), whose name they do not know and whose features they cannot describe, enter a home, they can go in after him without violating the Fourth Amendment. See *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976). And their conduct is not unreasonable just because they are not 100 percent sure that this person is the killer they were after—that it was indeed he, and not some look-alike, who had fled into the house. See *United States v. Stubblefield*, 621 F.2d 980 (9th Cir.1980); *United States v. Oaxaca*, 569 F.2d 518, 520–22 (9th Cir.1978); *United States v. Scott*, 520 F.2d 697 (9th Cir.1975); *United States v. Holland*, 511 F.2d 38, 44–45 (6th Cir.1975); *United States v. Shye*, 492 F.2d 886 (6th Cir.1974) (per curiam). This case is more difficult than those we have cited because the police had less reason to be confident that they really were in hot pursuit of the killer when they entered the Llagunos' house. But if we are right in our analysis of the situation that faced the police, there was a sufficient chain linking the house to the killer whom the police were pursuing to allow a reasonable jury to conclude that the police had probable cause to enter the house.

The search and seizure at the Llaguno home was over with when the police left a few hours after arriving. The 42-hour police detention of David Llaguno which ensued raises separate issues to which we now turn. If, as we believe the jury could reasonably have found in an error-free trial, the police were lawfully in the Llaguno house when they asked David to whom he had lent his car, then whether he refused to answer their question, as the police say, or answered with the name of his brother's accomplice, as he says, the police (whether or not they knew that Garcia, the name David says he gave them, was the name of the accomplice—a matter on which the record is unclear) had grounds for arresting him on suspicion that he was an accomplice in the crimes they were investigating. He had already acknowledged that the car used in the crimes was his. The discrepancy between the registration in Vilma Llaguno's name and David Llaguno's claim of ownership was not explored at trial; but the police were not required to ignore David's claim of ownership just because the license-plate check had shown that the car was registered to someone else, though with the same last name. Cf. *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 401 (7th Cir.1975); 1 LaFave & Israel, *supra*, § 3.3, at pp. 211–12.

"[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate." *Gerstein v. Pugh*, 420 U.S. 103, 113–14, 95 S.Ct. 854, 862–63, 43 L.Ed.2d 54 (1975). Although these words could be read to require that the arrested person be brought before a magistrate immediately upon arrival at the station house, instead they have been interpreted, consistently with language in the opinion contrasting "brief detention" after arrest, which is permitted, with "pro-

longed" or "extended" detention, which is not, see 420 U.S. at 114, 95 S.Ct. at 863, to allow some interval for booking the arrested person and completing other paperwork before presenting him to the magistrate. See, e.g., *Bernard v. City of Palo Alto*, 699 F.2d 1023, 1024–25 (9th Cir.1983) (per curiam).

■ It did not require 42 hours to book David Llaguno and complete other paperwork necessary for bringing him before the magistrate to determine whether there was probable cause to hold him. Magistrates were available throughout the period, and assistant state's attorneys twice told the police that there was insufficient evidence to place charges against David. The only reason for delay in bringing him before a magistrate was that the police hoped to build a case against David while he was in jail, and this is not a permissible reason for jailing someone indefinitely. It would inject an element alien to our system—imprisonment on suspicion, while the police look for evidence to confirm their suspicion. Of course the delay here was not indefinite, but it was almost two days; and with no better reason offered than that the police were still investigating David's possible involvement in the crimes of his brother, it was too long.

■ David Llaguno was thus entitled to a directed verdict that the defendants were liable for his being held in jail—at least beyond the brief period that would have been necessary to book him and bring him before a magistrate. The qualification is necessary to take care of the possibility that the police were lawfully in the house when they questioned David, so that his arrest, at least, was lawful. As we are about to see, the issue of the lawfulness of the entry will have to be retried. If the entry is found to have been unlawful, the issue may arise whether the police can use information obtained as a result of the entry—the fruit of unlawful conduct—to justify the arrest of David in this suit. The question would not be whether such information had to be excluded from evidence, as it would be in a criminal trial of David,

see *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The applicability of the exclusionary rule in civil proceedings is a controversial issue, see, e.g., *Immigration and Naturalization Service v. Lopez-Mendoza*, — U.S. —, 104 S.Ct. 3479, 3485–90, 82 L.Ed.2d 778 (1984); *Tirado v. Commissioner of Internal Revenue*, 689 F.2d 307, 309–15 (2d Cir.1982), unnecessary to resolve here. The exclusionary rule does not come into play until a search is found to have been illegal; the rule provides a sanction for an illegal search. The question here would be whether the arrest of David was legal because of what he told the police, even though they were able to question him only because they illegally entered the house where he lived. If he was coerced to respond to their questions, as he may very well have been, the information he gave could not be used to validate the arrest; but if he answered those questions voluntarily, it would be a jury question whether his decision to do so was an intervening cause which cut off the effect of the illegal entry.

■ The other plaintiffs, while not entitled to a directed verdict, are entitled to a new trial, because of cumulatively serious trial errors:

1. The entire instruction on probable cause was as follows: "[The jury must decide] whether the defendants reasonably believed that they had probable cause to enter the Llaguno house to arrest someone within it. What is a reasonable belief depends on the facts and circumstances within a defendant's knowledge. Probable cause to arrest exists if a reasonable person would have believed that a crime had been committed and that a person within the house had committed the offense." By defining "reasonable belief" solely in terms of the "facts and circumstances within a defendant's knowledge," the instruction deflects the reader (or hearer) from a central question: the reasonableness of the police in acting so hastily on the basis of their very limited knowledge, without investigating further. And the last sentence in the

instruction implies that if the police had reason to think there might be one criminal in the house, they were automatically entitled to round up all of the occupants of the house, including young children who could not possibly be criminals.

 We add that, on retrial, the instructions should emphasize the importance that the Fourth Amendment has been interpreted to place on having a magistrate make the judgment of probable cause. The burden of proof should be placed on the police to establish the existence of an emergency that prevented them from obtaining a warrant.

 2. The judge gave an instruction on immunity: "The law allows a defendant to defend a charge of unconstitutional entry by claiming a good faith belief that, under the circumstances, it was reasonable to enter the Llaguno house without a warrant. The defendant also must prove that such good faith belief was reasonable." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982), decided before the trial of this case, held that the good-faith or qualified immunity of a civil rights defendant is not an issue for the jury, other than in exceptional circumstances not presented here. The issue of immunity as redefined in *Harlow* is whether when the defendant violated the plaintiff's rights the law appeared to authorize the defendant's misconduct. This is an issue of law, for the judge to decide. What the defendant believed, an issue of fact, is neither here nor there. The good sense of *Harlow* in withdrawing the issue of immunity from the jury is particularly evident in a case such as this, where the police are charged with having acted without probable cause. The question whether they had probable cause depends on what they reasonably believed with reference to the facts that confronted them, as the judge instructed in the passage we quoted earlier. To go on and instruct the jury further that even if the police acted without probable cause they should be exonerated if they reasonably (though erroneously) believed that they were acting reasonably is to confuse

the jury and give the defendants two bites at the apple.

3 & 4. The judge told the jury that in evaluating the defendants' behavior it should "not use 20/20 hindsight," and "should consider the responsibility of the police to prevent crime, apprehend criminals, and to safeguard persons and property from criminal actions." These instructions were not wrong in the sense of stating untruths, but they were gratuitous and prejudicial. The term "20/20 hindsight" is a derisory expression for an ex post facto judgment. The plaintiffs were entitled to ask the jury to make such a judgment, evaluating the conduct of the police long after the fact. And to remind the jury, quite unnecessarily one would have thought, that the police are responsible for protecting the public safety is to place the judge's thumb on the balance in favor of a class of defendants already regarded sympathetically by most jurors. Cf. *Briscoe v. LaHue*, 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983); *Darbin v. Nourse*, 664 F.2d 1109, 1115 (9th Cir.1981).

 5. Over the plaintiffs' objections the judge allowed the defense to dwell in obsessive detail on the crimes that the police were investigating when they entered the Llagunos' home—to bring out such facts as that the number of wounds of some of the victims and the caliber of the gun used on them could not be determined because the wounds were so "massive," that a person had come running out of the tavern where the second robbery had taken place screaming "Oh God, they killed—they killed her, they killed her," and that a victim's "hand was cold and she was already starting to change color." These details were not irrelevant, because they helped to show the danger that the police were up against. But dwelt on in such detail they may have turned the jurors against the plaintiffs—who are, after all, the killer's close relatives, including his parents and brother. The judge should have found that the danger of unfair prejudice clearly outweighed the probative value of this evidence. Fed.R.Evid. 403.

We need not decide whether any one of these errors would warrant reversal in and of itself, or even whether all together would warrant reversal in a different kind of case. But bearing in mind that civil rights actions often pit unsympathetic plaintiffs—criminals, or members of the criminal class (even—in this case—a multiple murderer's parents and brother)—against the guardians of the community's safety, yet serve an essential deterrent function especially at a time like this when the exclusionary rule is being narrowed (see *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)), we take a serious view of trial errors that consistently favor the defendants in such a case. The fact that the jury brought in a judgment for the defendants even with respect to David Llaguno's complaint of unlawful detention suggests that the jury was indeed swayed by the errors.

The appellants make other complaints about the conduct of the trial that are not well taken. But for the reasons we have explained, the district court's judgment must be reversed and the case remanded with instructions to enter judgment for David Llaguno on Count VII and to grant the plaintiffs a new trial on all the other counts (plus a trial on Count VII limited to damages). Costs in this court to appellants.

REVERSED AND REMANDED.

CUMMINGS, Chief Judge, concurring in part and dissenting in part.

Having closely reviewed the facts of this case, I am compelled to agree with Judge Wood that plaintiffs' motion for a directed verdict on the issue of probable cause should have been granted and therefore join his vigorous dissent. I also believe that serious trial errors, particularly involv-

ing the jury instructions, occurred below, and that such errors alone do not permit a verdict for the police officers to stand in a Section 1983 case. Although in my view the probable cause issue never should have reached the jury, I cannot disagree with the position expressed in Judge Posner's opinion that, assuming a valid jury question was presented on that issue, plaintiffs are entitled to a new trial, and therefore join in his discussion of trial errors and concur in his decision to remand for a new trial. I also concur in his disposition of Count VII.

COFFEY, Circuit Judge, concurring in part and dissenting in part.[1]

I concur with the majority's analysis that the forty-two hour detention of James David Llaguno, without a determination of probable cause, violates the constitutional standards of the Fourth Amendment as set forth in *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). I also concur with the majority's result, though not its reasoning, that the presence of exigent circumstances and probable cause to enter the Llaguno home without a warrant were factual matters to be resolved by the jury. I strongly dissent, however, from the majority's erroneous conclusion that the district court committed trial errors sufficient to remand this case for a new trial.

According to the evidence introduced at trial, on January 7, 1980, at approximately 6:45 p.m., Detective James Troken and Officer Joseph Fallon, of the Chicago Police Department ("CPD"), received a police radio call that gun shots had been fired near the intersection of Wabansia Avenue and Whipple Avenue, in the City of Chicago, Illinois. The officers immediately proceeded to that location and, upon arrival, Detec-

---

1. As I understand the disposition of this case, five judges (Bauer, Eschbach, Posner, Coffey, and Pell) agree that the presence of exigent circumstances and probable cause to enter the Llaguno home without a warrant were factual matters, to be resolved by the jury. Another five judges (Cummings, Bauer, Eschbach, Posner, and Pell), agree that the plaintiffs are enti-

tled to a new trial. For the sake of clarity, because Judge Posner's opinion has a majority with my vote of approval, which is limited to the result that the issues of probable cause and exigent circumstances were proper jury questions, I will refer to Judge Posner's opinion as the majority.

tive Troken was directed to a corner grocery store where he observed three people lying on the ground, all of whom had been shot in the face and brutally murdered. According to Detective Troken, "[d]ue to the massive head wounds to the face area, it was impossible to tell how many [wounds] or what type of wound it was." Officer Fallon remained outside the store and began questioning bystanders concerning the shootings. Three male Hispanics stated that they had seen "a light-colored, four-door Ford, [with] primer on the door, and ... on the trunk." The car "pull[ed] up to the corner of Wabansia and Whipple. Two [Latino] men got out [and] went into the grocery store. One man stayed in the car." According to the three eyewitnesses, "they heard shots fired, and the two male Latinos who were going to the grocery store ... got in the car and left the scene." Following receipt of this information, Officers Troken and Fallon immediately began to search the surrounding area for the suspected murderers' automobile.

At approximately 8:00 p.m., while still conducting their search for the suspected murderers' vehicle, the officers heard a police radio broadcast that another armed robbery was in progress at 1858 West Wabansia Avenue. The officers, who were already "in the area," sped to the tavern located at that address and, upon arrival, questioned a female bartender. She explained that "two Puerto Ricans, male Puerto Ricans entered her tavern, ordered two bottles of Old Style, ... announced a stick-up and started firing with their weapons." The officers discovered that the bartender had been wounded in the hip and that another woman had been shot in the face and violently murdered. In addition, Officer Fallon interviewed an eyewitness who stated that he had "seen a light-colored Ford with two male Latinos go up to the corner of Wolcott and Wabansia, and they exited the car and went into the tavern." According to the eyewitness, the two male Latinos left "the bar after [he] had heard shots, ... with a young ten- or twelve-year-old female, girl, white girl...." The eyewitness added that the

suspects' automobile was a "light-colored Ford, four-door with primer on the door and the trunk." Officers Fallon and Troken received a partial license plate identification number of the vehicle from another eyewitness and then returned to police headquarters where they informed a Sergeant Mingey of the information they had obtained. Following this meeting with their sergeant, Officers Fallon and Troken began a search of the CPD's license plate and vehicle registration files in an attempt to determine the owner of the automobile in question.

At approximately 9:15 p.m., Sergeant Mingey radioed Officers Troken and Fallon to join him at the intersection of North Avenue and Oakley Avenue. Upon their arrival, the officers observed "a school bus parked on Oakley just north of North Avenue, with one of the windows apparently shot out, a squad car with one of the windows shot out, and ... a light-colored, four-door Ford with primer on the trunk and primer on the door." Mingey informed Officer Troken that:

> "another police vehicle had spotted the car because it was simulcast that we were looking for a Ford, four-door with primer marks, possibly with a female white youth in the back seat. There was allegedly a chase and there were shots fired. A police officer was wounded. One of the passengers—or one of the occupants of the vehicle wanted was wounded and other people had escaped."

The officers agreed that the vehicle "involved in this particular incident was the one used in ... the other two homicide-robberies." A check of the license plate number revealed that the light-colored Ford automobile was not reported stolen and was, in fact, registered to "[a] person by the name of Llaguno, 3852 West Wabansia," an address within the "proximity" of the four murders, the two armed robberies, the child kidnapping, the high-speed auto chase, and the police shoot-out.

The foregoing facts reveal that within a two-and-one-half-hour period, two young male Hispanics, one operating and one a

passenger in a light-colored Ford registered to a Llaguno at 3852 West Wabansia, shot and violently murdered four people, shot and wounded at least two others (including a police officer), committed two armed robberies, kidnapped a female child, attempted to flee police officers in a high-speed chase through the streets of west Chicago, engaged in a shoot-out with police officers within the "proximity" of the Llaguno residence, and fled from the scene of the shoot-out on foot. According to the facts then and there available to the police officers, the light-colored Ford auto, with primer on the trunk and door and a partial license identification, fit the description of the suspected murderers' vehicle; the vehicle was not reported stolen; the fleeing suspects were young Hispanics; and the vehicle was registered to a Llaguno (an Hispanic surname) at 3852 West Wabansia Avenue. Furthermore, the four murders, the two armed robberies, the child kidnapping, the high-speed auto chase, and the police shoot-out occurred within the "proximity" of the Llaguno residence; the suspects fled from the scene of the shoot-out on foot; and the CPD officers were well aware of the fact that fleeing felons often retreat to the sanctuary of their own home. Sergeant Mingey made a well-reasoned judgment that because of the gravity of the underlying offenses and the fact that the crazed murderers were still at large, he could not afford to wait the "[a]pproximately three hours" it takes to obtain a search warrant or the "[a]pproximately two hours, give or take another hour" it takes to obtain an arrest warrant. Mingey stated that "[t]here were too many people that were already killed and wounded and I had to put an end to it. We had to stop it." Thus, Sergeant Mingey proceeded to the Llaguno residence without first securing a search or arrest warrant, not only endangering his own life but also the lives of his fellow officers, in order to protect the public from the murderers at large. Sergeant Mingey immediately entered his squad car and traveled with Officers William Connors and Joseph Sparks to police headquarters, obtained a sledge-hammer and shotgun,

and returned to the Llaguno residence at 3852 West Wabansia where he met Officers Fallon and Troken. Mingey, Connors, and Sparks approached the front door of the Llaguno household while Fallon and Troken positioned themselves at the rear of the residence. Sergeant Mingey banged on the door stating, "Police. Open or we will break it down." Gloria Llaguno opened the front door and the CPD officers, armed with guns, entered the home, searching the main floor, upstairs, and basement levels for "a male Latin [sic] in his twenties by the the the name of Llaguno."

The issue before this court is whether we will approve the jury's finding that the CPD officers had probable cause and were presented with sufficient exigent circumstances to enter the Llaguno home without a warrant. The parties agree that the applicable law in this case is the Supreme Court's holding in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("*Payton*"), that the warrantless, nonconsensual entry into a home to effect an arrest, in the absence of exigent circumstances, violates the Fourth Amendment to the United States Constitution. In effect, the Court in *Payton* decided that "warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances." *Welsh v. Wisconsin*, — U.S. —, 104 S.Ct. 2091, 2097 (1984). According to this court's reasoning in *United States v. Acevedo*, 627 F.2d 68 (7th Cir.), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980), exigent circumstances are present when "the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." 627 F.2d at 70. I further note that "an important factor to be considered when determining whether any exigency exists is *the gravity of the underlying offense for which the arrest is being made*." *Welsh v. Wisconsin*, 104 S.Ct. at 2099 (emphasis added).

In the present case, the suspected felons, within a two-and-one-half-hour time span,

violently murdered four people, wounded at least two others, committed two armed robberies, kidnapped a female child, attempted to flee police officers in a high-speed auto chase through the streets of west Chicago, engaged in a shoot-out with those same police officers, and then fled from the scene of the shoot-out on foot in near "proximity" to the Llaguno residence. Sergeant Mingey testified that it would have taken three hours to obtain a search warrant and anywhere between one and three hours to obtain an arrest warrant. Common sense, logic, and the past experiences of well-trained law enforcement officers dictate that a delay of this magnitude, given the fact that the murderers were armed and still at large, would have exposed members of the public, as well as police officers in the area, to a greater threat of severe injury, danger, and possible death. Moreover, if the officers had surrounded the Llaguno residence in a stake-out and waited to obtain a warrant before entering the home, this inactivity would have allowed the suspected murderers to rearm and reestablish themselves in preparation for a possible second shoot-out with police. The element of surprise is of the utmost importance when dealing with a highly volatile arrest situation of this nature. Sergeant Mingey had no time to engage in the mental gymnastics suggested by the majority, speculating as to the risk of delay and the severity of the harm that would occur if such a risk materialized. Indeed, an academic analysis of this nature would be desirable, if possible, but in the everyday world of law enforcement, officers are all too frequently assaulted, maimed, and killed in the line of duty. For example, in 1983, eighty law enforcement officers were feloniously killed in the line of duty and another 62,324 were assaulted. U.S. Department of Justice, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 3, 39 (1983). The legal analysis suggested by the majority is impossible in the split-second determinations that a law enforcement officer is called upon to make in a life-threatening situation. It takes days, weeks, and sometimes even months for judges to reach a proper conclusion on the issue of exigent circumstances, thus we cannot require a "cop in the heat of battle" to completely withdraw himself from a life-threatening situation in order to ponder and weigh all of the variables involved. In light of the egregious facts presented in this case, it was certainly proper for the jury to find that exigent circumstances existed to justify the warrantless entry into the Llaguno home.

The next issue is whether the CPD officers had probable cause, combined with the exigent circumstances then and there existing, to enter the Llaguno home without a warrant. The officers' clear intent in entering the household at 3852 West Wabansia was to arrest a young male Hispanic in his twenties by the name of Llaguno, the prime suspect in four violent murders, two armed robberies, a child kidnapping, a high-speed auto chase, and a police shoot-out that had occurred within the "proximity" of the Llaguno home. According to the Supreme Court in *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), probable cause to make a warrantless arrest exists if "the facts and circumstances within [the policemen's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." 379 U.S. at 91, 85 S.Ct. at 225–26 (citing *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949)). *See also Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983). Thus, "[i]n dealing with probable cause, ... as the very name implies, we deal with probabilities. These

are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. at 175, 69 S.Ct. at 1310. *See also Illinois v. Gates*, 462 U.S. at 231, 103 S.Ct. at 2328; *Gerstein v. Pugh*, 420 U.S. at 121, 95 S.Ct. at 866–867; *United States v. Covelli*, 738 F.2d 847, 853 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984); *United States v. Watson*, 587 F.2d 365, 368 (7th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979). In making a determination of probable cause, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Illinois v. Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13.

In the present case, it was reasonable for the well-trained and experienced CPD officers to believe, based upon the available facts, circumstances, and information, that the armed and dangerous fleeing felon was a young Hispanic in his twenties by the name of Llaguno, residing at 3852 West Wabansia. The officers knew that the light-colored Ford automobile, with two distinct primer spots and a partial license identification, was registered to a Llaguno at this very address. The officers further knew, after checking their registration files, that the vehicle had not been reported stolen. Thus, it was reasonable to believe that Llaguno was operating the automobile. The officers were aware of the fact that Llaguno is an Hispanic surname, thereby corroborating the eyewitness descriptions of the fleeing felons as Hispanics. The officers also had knowledge of the fact that the four violent murders, the two armed robberies, the child kidnapping, the automobile chase, and the police shootout occurred within the "proximity" of the Llaguno residence and that the armed suspects had fled on foot. The well-trained and experienced officers agreed that fleeing felons often retreat to the familiar confines of their own home, especially when fleeing on foot and the home is within the nearby vicinity. Based upon these facts

and circumstances, the police officers certainly had "reason to believe the suspect [was] within" the premises of the Llaguno home at 3852 West Wabansia Avenue. *Payton*, 445 U.S. at 603, 100 S.Ct. at 1388–1389. Moreover, the CPD officers had sufficient facts "to warrant a prudent man in believing" that a male Hispanic in his twenties by the name of Llaguno, residing at 3852 West Wabansia Avenue, had committed a crime. Thus, unlike four members of this court, I am convinced that the CPD officers had sufficient facts to obtain an arrest warrant from a neutral magistrate, if time had permitted. *See, e.g., Powe v. City of Chicago*, 664 F.2d 639, 647 (7th Cir.1981) (suspect's nickname and address sufficient to obtain arrest warrant). Accordingly, the jury was entitled to find, as it did, that the CPD officers had probable cause to enter the Llaguno home without a warrant.

Rather than end the analysis at this point, and allow the jury verdict to stand, the majority erroneously asserts that the plaintiffs (except James David Llaguno) "are entitled to a new trial, because of cumulatively serious trial errors." I strongly disagree with the majority's needless venture into the valley of speculation. The majority initially claims that language from the probable cause jury instruction— "reasonable belief depends on the facts and circumstances within a defendant's knowledge"—is improper because it "deflects the reader (or hearer) from a central question: the reasonableness of the police in acting so hastily on the basis of their very limited knowledge, without investigating further." The majority errs for two reasons. First, this instruction states verbatim the well-settled standard of probable cause needed for a warrantless arrest, as set forth by the United States Supreme Court in *Beck v. Ohio*, 379 U.S. at 91, 85 S.Ct. at 225–226. Secondly, the majority confuses the issue of exigent circumstances with the issue of probable cause. The necessity for immediate police action in this case stems solely from the fact that officers were presented with an extremely dangerous, highly vola-

tile, and life-threatening situation. Within a two-and-one-half-hour period, two armed suspects had violently murdered four people, wounded two others, committed two armed robberies, kidnapped a female child, and engaged in a shoot-out with police. The officers could not afford the risk of another shoot-out and the loss of additional innocent lives while waiting to obtain a warrant. In view of this crisis, the CPD officers properly decided to make an immediate entry into the Llaguno home without securing a warrant or waiting to obtain additional information. The officers' decision to act immediately is an issue completely separate and apart from the question of probable cause—whether the CPD officers, at the time they entered the Llaguno home, had reason to believe, based upon the facts and circumstances within their knowledge, that a male Hispanic in his twenties by the name of Llaguno, residing at 3852 West Wabansia, had committed a crime. In considering this issue of probable cause, the jury was not to speculate as to how the police officers may have acted differently in a routine arrest situation, rather the jury was required to determine whether the officers, under the factual circumstances then and there existing, had probable cause to enter the Llaguno home. Thus, the district court properly instructed the jury that they need only consider the facts and circumstances available to the police officers, *at the time they decided to enter the Llaguno household,* in order to resolve the issue of probable cause.

The majority further asserts that the district court erred in instructing the jury that:

> "The law allows a defendant to defend a charge of unconstitutional entry by claiming a good faith belief that, under the circumstances, it was reasonable to enter the Llaguno house without a warrant."

According to this good faith immunity instruction, even if the jury found that the defendants entered the Llaguno home without probable cause and exigent circumstances, the jury could still find for the defendants if the officers reasonably believed, in good faith, that the entry was lawful. This instruction complies with the Supreme Court's ruling in *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (*"Pierson"*), that if the jury in a section 1983 lawsuit finds "the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional." 386 U.S. at 557, 87 S.Ct. at 1219. *See also Scheuer v. Rhodes,* 416 U.S. 232, 245, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974). Since the Supreme Court's decision in *Pierson,* it is settled law that police officers are entitled to a "qualified immunity from liability [under section 1983] for acts done on the basis of an objectively reasonable belief that those acts were lawful." *Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). *See also Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (*"Harlow"*), the Supreme Court clarified the "objective reasonableness" test, stating that:

> "qualified immunity would be defeated if an official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury....'"

457 U.S. at 815, 102 S.Ct. at 2737 (emphasis original) (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)). The Court added that:

> "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not

previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors."

457 U.S. at 818–19, 102 S.Ct. at 2738–39 (footnote omitted). Based upon the foregoing language in *Harlow,* the majority erroneously asserts that the affirmative defense of qualified immunity "is not an issue for the jury, other than in exceptional circumstances not presented here."

In the present case, the parties agree as to the applicable law—a warrantless felony arrest in a home is violative of the Fourth Amendment, absent probable cause and exigent circumstances. In view of the Supreme Court's decision in *Payton,* this rule of warrantless arrests is "clearly established law," however, the related concept of probable cause is, at best, amorphous. Indeed, this case vividly demonstrates the differing legal views of probable cause. The original panel, as well as four judges on the *en banc* panel, believe that the CPD officers lacked probable cause to enter the Llaguno home, as a matter of law, *see Llaguno v. Mingey,* 739 F.2d 1186, 1190–94 (7th Cir.1984), but the majority now holds that there are sufficient facts "to allow a reasonable jury to conclude that the police had probable cause to enter the house." Despite this clear difference of opinion, the majority asserts that under *Harlow,* the affirmative defense of good faith immunity is a question of law for the district court to decide, not a question of fact to be resolved by the jury. I find the majority's position to be unsound. The distinguished members of this court cannot even agree on the existence of probable cause in this case, yet the majority instructs the district court to decide, for purposes of this section 1983 lawsuit, whether the law of probable cause

was clearly established at the time the police officers entered the Llaguno home and, if so, whether the officers knew or reasonably should have known of that law. From my vantage point, this is an improper burden to place upon the district court.

The majority acknowledges that the issue of probable cause in this section 1983 lawsuit is a question of fact for the jury because "there is room for a difference of opinion." So too, there is room for a difference of opinion on the issue of whether the actions of the CPD officers conformed to the standard of "objective reasonableness" as set forth by the Supreme Court in *Harlow.* Thus, the issue of good faith immunity in this case is a question of fact for the jury to decide. *See, e.g., Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1347–48 (7th Cir.1985) (opinion of Coffey, J.); *Bledsoe v. Garcia,* 742 F.2d 1237, 1239–40 (10th Cir.1984); *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1466–67 (9th Cir.1984); *B.C.R. Transport Co. v. Fontaine,* 727 F.2d 7, 10–11 (1st Cir.1984). *But see Trejo v. Perez,* 693 F.2d 482, 486–88 (5th Cir.1982). The majority asserts that a jury instruction on the issue of good faith immunity will "give the defendants two bites at the apple." I believe that this is the intent of the immunity instruction— to protect law enforcement officers who act in a reasonably objective manner while, at the same time, safeguarding the constitutional rights of our citizens to be free from unwarranted intrusions into their homes. After all, police officers are often called upon to make split-second judgments, when reacting to dangerous criminals' all too frequent fatal assaults. The job of a police officer in protecting members of the public is an extremely difficult task which will be made far more burdensome by the threatened imposition of liability for mistakes in instantaneous judgments that we as judges often take days, weeks, and even months to ponder. *See Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.,* 456 F.2d 1339, 1349 (2d Cir.1972), *on remand, see* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Lumbard, J., concurring). Ac-

cordingly, I am convinced that it was proper to instruct the jury on the CPD officers' good faith immunity defense.

The majority next claims that it was error to instruct the jury:

> "Now ladies and gentlemen, in a sense, we are here in the neutrality and in the detachment of the courtroom. However, what you must do in the jury room is not use 20/20 hindsight, but put yourselves in the position of these plaintiffs and these defendants at the time that the incidents occurred, and that takes the combined efforts of all of you."

The record reveals that this directive was an informal summary instruction given to the jury before a formal recitation of the written instructions. The instruction accurately informs the jury that it is to consider the actions of the plaintiffs *and* the defendants at the time the incident occurred. Indeed, the standard is what a well-trained law enforcement officer of ordinary intelligence, prudence, and judgment would have done in the position of the defendant officers under the facts and circumstances then and their existing at the time of the entry into the house without a warrant. *See, e.g., Beck v. Ohio*, 379 U.S. at 91, 85 S.Ct. at 225–26; *Brinegar v. United States*, 338 U.S. at 175–76, 69 S.Ct. at 1310–11; *Carroll v. United States*, 267 U.S. at 162, 45 S.Ct. at 288. I disagree with the majority that the district court judge's prefatory remarks were in any way "gratuitous and prejudicial."

The majority further claims that the district court erred in instructing the jury that:

> "Probable cause to arrest James David Llaguno existed if, based on the objective facts and circumstances of this case, a person would have reasonably believed that the plaintiff was committing or had committed a criminal act. An assessment of the reasonableness of a defendant's conduct in making the arrest should consider the responsibility of the police to prevent crime, apprehend criminals, and to safeguard persons and property from criminal actions."

The facts of this case reveal that James David Llaguno was a young male Hispanic in his twenties who was present at the Llaguno home when the police entered. Based upon the fact that James admitted to the police that he owned the light-colored, four-door Ford registered to a Llaguno at 3852 West Wabansia Avenue and the fact that he fit the description of a young male Hispanic in his twenties by the name of Llaguno, residing at 3852 West Wabansia Avenue, the police arrested James. The record further reveals that no charges were ever brought against James for the events that transpired in the "proximity" of the Llaguno home on the evening of January 7, 1980. Thus, the section 1983 lawsuit included a claim that the CPD officers unlawfully arrested James.

The district court judge properly instructed the jury members that when considering James' claim of unlawful arrest, they should review the facts available to the CPD officers at the time of the arrest, not the facts that occurred subsequent to that arrest (i.e. James' release without charge). According to the facts presented to the CPD officers, within a two-and-one-half-hour period, two young male Hispanics about twenty years of age, in a light-colored Ford registered to a Llaguno at 3852 West Wabansia, violently murdered four people, wounded two others, committed two armed robberies, kidnapped a female child, attempted to flee police in a high-speed auto chase, engaged in a shoot-out with police within the "proximity" of the Llaguno home, and fled from the shootout scene on foot. The police officers were faced with a volatile and dangerous situation that called for immediate action in order to prevent more needless deaths and serious injury to innocent members of the public and the police force. The jury was required to consider the very real threat to members of the public as well as the CPD officers' duty to respond immediately to the grave situation at hand. I fail to understand how the district court judge's accurate instruction is analogous to placing a "thumb on the balance in favor of [the] ...

defendants," and I believe the majority's comment to that effect is completely uncalled for in light of the evidence in this record.

The majority finally asserts that the district court erred in allowing the defendants to "dwell in obsessive detail on the crimes that the police were investigating when they entered the Llagunos' home." On this point, the majority fails to adequately review the record. The plaintiffs filed a motion *in limine* to "bar evidence regarding the details of the crimes that the defendants were investigating." The judge ruled that the defendants could "go into objective facts, but not ... editorialize or characterize the facts." The judge added that "I will let you prove [the officers'] state of mind based on objective facts." During trial, the judge informed the jury that "an issue in a case such as this is the state of mind of the investigating officers. For that purpose, I permit a description of the objective facts." A thorough review of the record reveals that the district court judge meticulously held the defendants to this standard and when they crossed the line, the judge admonished the jury. For example, the judge stated on one occasion:

> "The last comment by the officer that this was the most heinous crime he had ever seen should be disregarded by you. That is not an objective fact. You are required to listen to the objective facts, not to any characterization of those facts."

It is well-settled that "the balancing of probative value and prejudice is committed to the sound discretion of the trial judge and we are obligated to give great deference to the evidentiary ruling of the trial court." *United States v. Baskes,* 649 F.2d 471, 481 (7th Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). *See also United States v. Taylor,* 728 F.2d 864, 871 (7th Cir.1984). The district court judge was in the best position to determine the prejudicial impact of the officers' crime scene descriptions and the judge's admission of objective facts, when viewed in the context of the trial as a whole, does not rise to the level of an abuse of discretion.

In accord with the foregoing analysis, I would affirm the jury's verdict in favor of the defendant police officers and hold that under the facts and circumstances known to the officers, they had probable cause and were presented with sufficient exigent circumstances to enter the Llaguno household without a warrant.

HARLINGTON WOOD, Jr., Circuit Judge, with whom CUMMINGS, Chief Judge, and CUDAHY and FLAUM, Circuit Judges, join, dissenting in part and concurring in part.

The essence of Judge Posner's opinion, as I read it, is simply that when you are short on probable cause you can make up that shortage by adding exigent circumstances. I cannot accept that dangerous, unnecessary, and indefinable blending of two separate and useful traditional concepts in order to justify a warrantless search of a private home at night. The bad factual circumstances in this case are leading us to bad law for future cases.

To build the issue into even a "close line" jury question between reasonable and unreasonable police behavior the opinion indulges in one obvious speculation after another with even a little help from Chekhov. If this court is to indulge in that kind of speculation as a basis for an opinion we are setting a bad precedent for the police whose exigent circumstance imaginations to avoid magistrates will now be given free rein; and juries will be invited to do the same when it is their turn.

If, as the opinion holds, exigencies can substitute for probable cause, we are in effect sanctioning warrantless nighttime home entries for which no warrant would have been issued if one had been sought from a judicial officer. This is clearly an anomalous and untoward result. It seems to me that you have to concede that probable cause in the traditional sense is lacking in this case, and that a magistrate would not have authorized the search warrant. This is why the majority needs to invent

this new blended warrantless search concept.

There is no dispute about the actual hard facts. On that factual basis I believe as the original majority did that the issue is ripe for a legal finding of no probable cause. If a jury were to find otherwise, the verdict should be set aside. Perhaps if we were just sending this case back to a jury to make the probable cause decision properly instructed in traditional search terms I would not object so strongly. However, the jury will now have to be instructed with this new "mix-it-all-up-together" rule invented in this case. We will be headed into trackless legal underbrush. A person should be more secure in his home than that.

I had not thought it necessary until now to defend the revered privacy of a person's home from warrantless nighttime police searches. To cross another person's threshold at night without a warrant should still require sufficient showing of both probable cause and exigent circumstances. This view finds support in *Payton v. New York*, 445 U.S. 573, 587–88, 100 S.Ct. 1371, 1380–1381, 63 L.Ed.2d 639 (1980) and its progeny *Welsh v. Wisconsin*, —— U.S. ——, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). *Payton* established that probable cause to believe a felony suspect was in a private residence is not sufficient to justify a warrantless, in-home entry. Exigent circumstances are also necessary. There is no intimation in *Payton*, in its progeny *Welsh*, or in any other case I have found involving in-home, warrantless entries that exigencies can substitute for, or allow the relaxation of, the probable cause requirement. As the Court said in *Whiteley v. Warden*, 401 U.S. 560, 566, 91 S.Ct. 1031, 1035–36, 28 L.Ed.2d 306 (1971), "[l]ess stringent standards for reviewing the officer's discretion in effecting a warrantless arrest and search would discourage resort to the procedures for obtaining a warrant. Thus the standards applicable to the factual basis supporting the officer's probable-cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment."

However, all that aside, even if I were to embrace this new probable cause-exigent circumstances mix, which I do not, I would find the circumstances in this case, as bad as this murderous rampage was, to be somewhat less urgent than the opinion pictures them. After all a magistrate was in fact available. That is not unusual in metropolitan areas where police crises are common at night. The policemen who drove back to their headquarters to pick up the shotgun and the sledgehammer to force their way into the home would have been better advised to have gone to see the magistrate and let some other policemen, of which there was no shortage, pick up that equipment in case it might be needed. When the police rushed through the front door of the home with drawn guns and herded together all ten occupants, including children, there were at least six officers already at the scene, and others could have been summoned. It can be argued that a little calmer approach might have been advisable. The home could have been watched and a safe strategy devised while a magistrate was consulted. If the felon was actually in the home there was no reason to believe he would take his own family hostage and sacrifice them. Experience has demonstrated negotiations are possible and often successful even in extreme situations. Sometimes the macho urge to charge is more dangerous and ill-advised than a more thoughtful consideration of the situation. The police were still in the home when the missing felon was apprehended elsewhere. The whole bad home scene could have been avoided. The judgment of a judicial officer was needed and there was time and reason to do it right. The fight against crime will be aided, not deterred, by holding fast to traditional democratic and common law principles. To do otherwise is to sanction vigilantes in blue.

Therefore, I respectfully dissent from Judge Posner's disposition of the unlawful entry charge, but I concur in the disposi-

tion of David Llaguno's unlawful detention charge.

CUDAHY, Circuit Judge, dissenting:

Although Judge Posner has graphically described the very real dilemma facing the police and the hard choices which they confront under these dangerous and extraordinary circumstances, the considerations cited by Judge Wood must ultimately be controlling for me. There are extremely compelling reasons for leaving a case like this one to a jury verdict but the even more fundamental reasons advanced by Judge Wood for not doing so must in the end prevail. I therefore concur fully in Judge Wood's opinion.