Kenneth W. REICH, Plaintiff,

v.

Michael MINNICUS and Larry Bowmer, Defendant.

No. IP 90–276–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 22, 1993.

John Emry, Franklin, IN, for Kenneth W. Reich.

David L. Steiner, Deputy Atty. Gen., Indianapolis, IN, for Michael Minnicus and Lawrence Bowmer.

### ENTRY DENYING PLAINTIFF'S MOTION FOR NEW TRIAL

FOSTER, United States Magistrate Judge.

The plaintiff moves for a new trial on the ground that the jury's verdicts in favor of both defendants are against the weight of the evidence. The defendants responded. For the reasons set forth below, the Court denies the motion.

The plaintiff brought this suit under 42 U.S.C. § 1983 against the defendant Indiana State Police Officers alleging that they violated his Fourth Amendment rights when, in August of 1989, they twice entered his property without a warrant and searched for and seized evidence of possible violations of federal and state laws. The defendants testified that they went to the plaintiff's residence on the first occasion in order to investigate an anonymous tip that there was a vehicle on the plaintiff's property with a missing Vehicle Identification Number ("V.I.N."), a possible violation of Indiana and federal laws. The defendants testified that after receiving no response to their knock at the plaintiff's house, they noticed persons walking around a garage or shop building about one hundred feet behind the residence. At that time, the rear portion of the plaintiff's property was surrounded by a fence which started behind the house and enclosed the shop building. There was no gate across the driveway which continued through the fence to the garage-shop building. The defendants testified that they drove back to the shop building, identified themselves to the plaintiff, and received his consent to examine vehicles and vehicle parts which were located in and around the shop building. The officers recorded V.I.N. numbers and left the property. Evidence presented at trial indicated that six days later, after determining that certain vehicle parts located on the plaintiff's property were from a stolen vehicle, the officers returned to the plaintiff's property and again drove back to the shop building without a warrant; they informed him of the results of their initial investigations and received his permission to search for and seize the alleged stolen parts and any other vehicles or vehicle parts that the officers believed might be stolen or possessed in violation of Indiana or federal laws.

The plaintiff asserts that his uncontradicted evidence showed that the property surrounding his shop building was protected curtilage and therefore that the defendants violated his Fourth Amendment rights when they initially drove through the gate and proceeded to his shop building. Because the defendants had no right to be where they were when they allegedly asked the plaintiff for permission to search, the plaintiff con-

tends any consents he gave were void as a matter of law as "fruits of the poisonous tree." The plaintiff concedes that the relevant Court's instructions accurately stated the law. (Brief in Support of Plaintiff's Motion For New Trial ("Plaintiff's Brief"), p. 12).

### Standard.

Rule 59, Federal Rules of Civil Procedure, provides that a new trial may be granted following a jury verdict "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...."

> The test to be applied in determining whether a motion for a new trial should be granted is whether "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

*General Foam Fabricators v. Tenneco Chemicals, Inc.*, 695 F.2d 281, 288 (7th Cir.1982). *See Davlan v. Otis Elevator Co.*, 816 F.2d 287, 289 (7th Cir.1987); *Valbert v. Pass*, 866 F.2d 237, 239 (7th Cir.1989); *Fleming v. County of Kane, State of Illinois*, 898 F.2d 553, 559 (7th Cir.1990); *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1182 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2805, p. 37 (1973). "The authority to grant a new trial is confided almost entirely to the discretion of the trial court." *Spanish Action Committee of Chicago v. City of Chicago*, 766 F.2d 315, 321 (7th Cir.1985) (*citing Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980)); *see Forrester v. White*, 846 F.2d 29, 31 (7th Cir.1988).[1]

■■ In determining whether to grant a new trial, the trial judge should accord great deference to the jury's verdict, *Foster v. Continental Can Corp.*, 783 F.2d 731, 735

(7th Cir.1986); *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 756 F.Supp. 1191, 1192 (W.D.Wis.1991), *affirmed,* 978 F.2d 395 (7th Cir.1992), and should not grant a new trial "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done", 11 Wright & Miller, § 2803, p. 32. Courts should exercise their discretion to prevent miscarriages of justice and should disregard errors or defects which do not impact substantial rights of the moving party. *See* 11 Wright & Miller, § 2805, p. 41. Unlike on a motion for a judgment *n.o.v.* or for a directed verdict, a trial judge ruling on a Rule 59(a) motion for a new trial may weigh the evidence and determine the credibility of witnesses, *Spanish Action Committee*, 766 F.2d at 321, may grant the motion even in the presence of substantial evidence for the non-moving party, and is not required to read the evidence in the light most favorable to the non-moving party. *See* 11 Wright & Miller, § 2806, p. 43.

### Discussion.

■■ The Court instructed the jury in part as follows regarding the issue of curtilage:

> This right of privacy in the home, which is protected by the Fourth Amendment against unreasonable searches and seizures, applies also to the "curtilage" around the home. The curtilage is the area around the home which encompasses those intimate activities associated with domestic life and the privacies of the home. In determining whether a particular area is within the curtilage, you may take into account the proximity of the area to the home, whether and how the area is enclosed, the nature of the uses to which the area is put, and the steps taken by the possessor to protect the area from observation or access by the public....

> The Fourth Amendment's protections also extend to private businesses not open

---

1. A trial judge's discretion to grant new trials is ultimately limited, and the principle of finality enforced, by the rule that successive new trials may be granted "only in the most exceptional cases." *Massey–Ferguson Credit Corp. v. Webber*,

841 F.2d 1245, 1250 (4th Cir.1988) (" 'When two juries have reached substantially the same result the possibility of a miscarriage of justice is very slight' ... Some things must come to an end." (*quoting,* 11 Wright & Miller § 2803, p. 35)).

to the general public. In that case, the concept of curtilage applies to the business premises just as with a dwelling.

Instruction no. 9. The plaintiff devotes much of his brief to reviewing the evidence he presented showing that his shop building was located within the curtilage of his home or business and he emphasizes that this evidence was uncontradicted. As the instruction suggested, however, the factors defining the curtilage of a home or business are necessarily flexible, indefinite, and fact-sensitive, requiring evaluation and interpretation in the particular context. After observing and hearing the evidence during trial, the Court is not left with the distinct impression that the jury's verdict represents a miscarriage of justice. The jury could have taken the raw facts and opinions presented at trial; evaluated them in totality, in context, and in the light of their own experience; and come to the reasonable conclusion, well-supported in the evidence, that the plaintiff's garage building was not located within the curtilage of his home or business. The defendants did, in fact, offer contrary evidence—*e.g.,* the lack of a gate, the well-travelled driveway, the appearance of a hobby or personal business being conducted at the building, the absence of exclusionary signs, and the disrepair of portions of the surrounding fence—and they argued contrary interpretations of the plaintiff's evidence. The Court cannot say, after reviewing the evidence presented at trial, that the jury's conclusion that the property surrounding the plaintiff's shop building was not curtilage would have been against the weight of the evidence.

Such a finding, however, was not required to sustain the jury's verdict. After defining the concept of curtilage, the Court instructed the jury as follows:

> You must decide whether the areas traversed by the defendants when they initially entered his property (the driveway and any ground traversed in encountering the plaintiff) were protected curtilage, and thus, that they violated the plaintiff's Fourth Amendment rights by driving back to his shop in order to contact him, without a warrant or exception to the warrant requirement. You must also decide whether,

and how much of, the areas searched by the defendants on the plaintiff's property constituted his protected curtilage, thus requiring a warrant or exception to the warrant requirement in order to enter and search.

Instruction no. 9. This instruction, to which the plaintiff did not object and does not now object, separated the object of the jury's curtilage analysis into two parts: first, the property around the garage structure and second, the access routes to the structure. Law enforcement officers on legitimate business do not violate the Fourth Amendment when they enter a curtilage over routes which are expressly or impliedly open to the public for access. 1 Wayne R. LaFave, *Search and Seizure,* 2nd ed., § 2.3(c), p. 393 (1987); *People v. Houze,* 425 Mich. 82, 387 N.W.2d 807, 811 n. 1 (1986); *State of Washington v. Seagull,* 95 Wash.2d 898, 632 P.2d 44, 47 (1981) (*en banc* ); *People v. Thompson,* 221 Cal.App.3d 923, 270 Cal.Rptr. 863, 873 (2nd Dist.1990), *review denied* (Sept. 26, 1990); *State v. Elkins,* 155 Vt. 9, 580 A.2d 1200, 1202 (1990); *Brown v. State,* 75 Md. App. 22, 540 A.2d 143 (Md.App.), *cert. denied,* 313 Md. 31, 542 A.2d 858 (1988); *State v. Carter,* 54 Or.App. 852, 636 P.2d 460 (1981); *Commonwealth v. Carelli,* 377 Pa.Super. 117, 546 A.2d 1185, 1193–94 (1988), *appeal denied,* 521 Pa. 609, 557 A.2d 341 (1989). Although the plaintiff does not separately address the issue of the constitutional character of the access routes to his shop building, the Court gleans from his brief the contention that the uncontradicted evidence at trial showed that (1) although he carried on a business in the garage structure, customers were not invited to, and did not in fact, visit the structure, (2) the structure's distance from the road and location behind his house and fence indicated that it was not open to the public, (3) there were no signs of invitation to the public to travel down the driveway to the structure, and (4) the lack of a gate across the driveway leading to the structure was not intended by him to allow public access to the structure. The plaintiff concedes, however, that there were no "no trespassing" signs posted, there was a well-beaten path from house to garage, it was apparent from observation that he was pur-

suing a business or hobby at the garage, there was no gate across the driveway, and the driveway was "visibly well used to travel to and from the shop." On the basis of these and other facts presented at trial, the weight of the evidence would not have been against a jury conclusion that the plaintiff did not have a reasonable expectation of privacy which society was prepared to accept in the access routes to his garage structure. Again, a determination of whether the garage access routes constituted protected curtilage or normal public access would have depended on the jury's evaluation of the evidence presented, regardless of whether that evidence was presented only by the plaintiff or also by the defendants. *Carelli, supra.*

The plaintiff's motion also falters on his assumption that if the defendant officers' initial entry onto his property was unconstitutional, any consents obtained thereafter were "invalid—worthless" as "fruits of the poisonous tree" in accordance with *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). (Plaintiff's Brief, p. 1). Surprisingly, the defendants do not contest this interpretation of the law, or its applicability to this case, despite its being the crux of the plaintiff's argument.[2] This statement of the law, however, is incorrect both in its description of the "poisonous fruits" doctrine and in its assumption that the doctrine applies in this case.

The "fruits of the poisonous tree" doctrine provides that evidence obtained following or during illegal police conduct—*e.g.,* confessions obtained during illegal custodial interrogation or consents obtained following an illegal entry—are inadmissible at trial if the statements or other evidence were obtained as a result of the prior illegality and not as a result of the accused's exercise of free will. *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983); *Wong Sun, supra; United States v. Morgan,* 725 F.2d 56, 58 (7th Cir.1984); *United States v. Sanchez–Jaramillo,* 637 F.2d 1094, 1099 (7th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980). The evidence is excluded as "tainted fruit" of the "poisonous tree" of the original unconstitutional conduct. Rather than providing a *per se* standard of inadmissibility, as the plaintiff asserts, however, the doctrine requires that "[i]n determining whether evidence is tainted by a prior illegality, we must determine whether the evidence was ' "come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint." ' " *United States v. Valencia,* 913 F.2d 378, 382 (7th Cir.1990) (*quoting Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984)) (original brackets and emphasis). Thus, for purposes of determining whether a confession, consent, or other statement obtained in these circumstances should be suppressed, its voluntariness under the Fourth or Fifth Amendment is only a threshold requirement, *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); a court must further determine "if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint,' " *Segura,* 468 U.S. at 805, 104 S.Ct. at 3385 (*quoting Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). A broad "but for" relationship is not the standard for dissipation, *Wong Sun,* 371

---

**2.** The plaintiff's brief begins:

"Plaintiff contended at trial that Defendants had no right to charge onto his property either time in August of 1989 and that the subsequent searches and seizures were illegal *ab initio.* This contention was outcome determinative at trial since the Defendants' entire defense rested on Plaintiff's alleged consent to each entry, all of the searches, and every seizure. If the initial entry was illegal, then any consent obtained as a consequence was invalid—worthless. *Wong Sun v. United States,* 371 US 471, 487–88, 83 SCt 407, 417, 9 LEd2d 441 (1963) (cited by *Harless v. State,* 577 NE2d 245, 249 (Ind App 1991). Ab-

sent a valid consent, Defendants had no right to enter and, therefore, no right to do anything that followed."

(Plaintiff's Brief, p. 1). The plaintiff then presents the law defining the parameters of a curtilage and extending the curtilage protection to business properties. He then details the evidence presented at trial which he contends clearly demonstrated that the property on which the garage building stood was protected curtilage. Nowhere does he discuss evidence tending to show that his consents were obtained through exploitation of the alleged illegal entry or that the original taint of the entries remained.

U.S. at 487–88, 83 S.Ct. at 417; *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); rather, courts look for a "close causal connection" between the illegality and the evidence or consent obtained, *Dunaway*, 442 U.S. at 218, 99 S.Ct. at 2259. The taint of illegality can be removed if the evidence is obtained from an independent source unrelated to the illegality, *Segura, supra*, if the evidence would have been inevitably discovered through "clean" sources, *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), or if circumstances demonstrate that the taint is sufficiently attenuated, *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. Factors informing the determination of whether the taint has been sufficiently attenuated include "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct", *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62, as well as whether the declarant was given notice of his right to refuse, *Sanchez–Jaramillo*, 637 F.2d at 1099.[3]

▮ Neither the plaintiff nor the defendants either on this motion or at trial litigated factors tending to show attenuation or continuation of taint and no instruction on the "poisonous fruits" doctrine or attenuation was requested or given. Consequently, because resolution of the "poisonous fruits" issue requires more than a determination that the defendants' initial entry was illegal, and the plaintiff and the defendants fail to address the relevant standard, the issue is not properly presented and the Court cannot grant the plaintiff's motion for a new trial on this basis.

▮ Furthermore, the "fruits of the poisonous tree" doctrine does not apply in this civil rights case. The doctrine is an application of the exclusionary rule announced in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and extended to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Although these cases and much of their progeny described the rule as a Constitutional mandate,[4] the Supreme Court has now clearly broken with that analysis and has declared that the rule derives solely from judicial prudence:

> The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "work[s] no new Fourth Amendment wrong." The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, and the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through is deterrent effect, rather than a personal constitutional right of the party aggrieved."

> Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."

*United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411–12, 82 L.Ed.2d 677 (1984) (citations omitted). The sole office of the exclusionary rule, therefore, is to prevent the admission of evidence at trial, not to define

---

**3.** This description of factors in *Brown* was not meant to be exhaustive. Rather, the Supreme Court specifically stated that "[t]he question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibility of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test." *Brown*, 422 U.S. at 604, 95 S.Ct. at 2261.

**4.** *See, e.g., Weeks*, 232 U.S. at 398, 34 S.Ct. at 346 (district court's refusal to order return of illegally seized evidence and its admission of that evidence at trial constituted "a denial of the constitutional rights of the accused"); *Mapp*, 367 U.S. at 649, 657, 81 S.Ct. at 1688, 1693 (". . . the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments. . . .").

constitutional rights or violations. The rule "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976). A court's determination of whether to apply the rule in a particular context is governed by balancing the "substantial social costs exacted" by exclusion of probative evidence of guilt against the effect of deterring police misconduct. *Leon,* 468 U.S. at 907–08, 104 S.Ct. at 3412; *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 1041, 104 S.Ct. 3479, 3484–85, 82 L.Ed.2d 778 (1984) (*quoting United States v. Janis,* 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976) (*quoting United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974))). Because the purpose of the exclusionary rule is to deter future Constitutional violations, " '[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.' " *Leon,* 468 U.S. at 908, 104 S.Ct. at 3412–13 (*quoting United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)).

The Court in *Leon* noted that "[p]roposed extensions of the exclusionary rule to proceedings other than the criminal trial itself have been evaluated and rejected under the same [cost/benefit] analytical approach," *Leon,* 468 U.S. at 909, 104 S.Ct. at 3413, and it further observed that "[s]tanding to invoke the rule has thus been limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct", *id.,* at 910, 104 S.Ct. at 3413. Since *Leon,* the exclusionary rule has generally been extended only to encompass so-called "quasi-criminal" cases prosecuted by government agencies such as civil forfeiture actions arising from criminal convictions. *See* 1 LaFave, § 1.7. In this case, not discovering direct authority for applying the exclusionary rule in actions brought under 42 U.S.C. § 1983, and having undertaken *Leon's* balancing

analysis, the Court concluded that the marginal deterrent value of excluding probative, reliable evidence in civil rights actions does not outweigh the costs. The Supreme Court has acknowledged the already greater deterrent effect and lesser societal cost of the private civil rights action remedy over the exclusionary remedy, *Malley v. Briggs,* 475 U.S. 335, 344, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986), and it seems unnecessary, therefore, to increase the deterrence. Unlike a criminal or quasi-criminal prosecution where the issue is whether a person committed a wrong against society and the court wields the exclusionary power to prevent the government from profiting from its officers' unconstitutional conduct, the issue in a civil rights action is specific and personal: whether specific governmental officers have personally violated a person's constitutional rights. Each separate constitutional violation is specifically sanctioned and there is thus no danger of the government profiting from its abuses. Deterrence is served well-enough by the inability of the State to use such evidence in their case-in-chief in any criminal prosecution and by the personal liability of the officers for damages.

Section 1983 provides a private tort remedy against state actors who deprive persons of "rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983. Under the Fourth Amendment, the constitutionality of a warrantless search or seizure conducted pursuant to a person's consent depends on whether that consent was freely and voluntarily given or was coerced, as judged by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 227, 93 S.Ct. 2041, 2045, 2047–48, 36 L.Ed.2d 854 (1973).[5] The plaintiff here does not move for a new trial on the grounds that the weight of the evidence clearly indicates that his consent was involuntary, and such a contention would have proven fruitless. Suppressing all evidence of the plaintiff's free and voluntary consent in this case, therefore, would have the unconscionable effect of holding the de-

---

5. The burden of proving the consent exception to the Fourth Amendment's warrant requirement was placed on the defendants at trial, as in a

suppression hearing. *See Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985) (*en banc*).

fendants liable in damages for their *constitutional* post-consent searches and seizures solely because of the alleged initial unlawful entry for which they would necessarily already have been held liable in damages. Such a result would constitute not only a needless double deterrent but a recovery, for constitutional conduct, which is not authorized under § 1983.

Discussion in one Seventh Circuit case may suggest that the exclusionary rule has a substantive effect in civil rights cases. In *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir. 1985) (*en banc*), one of the plaintiffs, David Llaguno, brought a § 1983 suit against members of the Chicago Police Department alleging that their detention of him for forty-two hours following his arrest, without filing charges or taking him before a magistrate, violated his Fourteenth Amendment rights. In that case, police officers in pursuit of perpetrators of a violent crime spree believed that they had tracked a suspect to a particular residence. Without a warrant, the officers knocked on the door and ordered it to be opened. When an occupant opened the door, the officers immediately entered the residence, rounded up the occupants, including David Llaguno, and began interrogating them. Because of David Llaguno's answers and refusals to answer, the officers arrested him and placed him in detention. He was released forty-two hours later. In the appeal of the subsequent civil rights action brought by several of the occupants, including David Llaguno, the Seventh Circuit held that while the pursuit of the suspects was a sufficient exigent circumstance for the officers to enter a house without a warrant, it was still a jury question whether they had probable cause to believe that a suspect was in the particular house entered. *Id.* at 1567. The Court further held that David Llaguno's responses to the officers' questions, in isolation, could have supplied the officers with probable cause to arrest him. *Id.* at 1567–68. The specific issue before the Court in David's case was whether his 42–hour detention without charges or a judicial determination of probable cause was unconstitutional. The Court held that it was and ordered that judgment be entered on remand in favor of David Llaguno with a trial to be held only on the question of damages. *Id.* at 1568, 1570.[6] Judge Posner wrote in the plurality opinion:

David Llaguno was thus entitled to a directed verdict that the defendants were liable for his being held in jail—at least beyond the brief period that would have been necessary to book him and bring him before a magistrate. The qualification is necessary to take care of the possibility that the police were lawfully in the house when they questioned David, so that his arrest, at least, was lawful. As we are about to see, the issue of the lawfulness of the entry will have to be retried. If the entry is found to have been unlawful, the issue may arise whether the police can use information obtained as a result of the entry—the fruit of unlawful conduct—to justify the arrest of David in this suit. The question would not be whether such information had to be excluded from evidence, as it would be in a criminal trial of David, see *Wong Sun v. United States,* . . . . The applicability of the exclusionary rule in civil proceedings is a controversial issue, see, e.g., *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032 [1042–53], 104 S.Ct. 3479, 3485–90, 82 L.Ed.2d 778 (1984); *Tirado v. Commissioner of Internal Revenue,* 689 F.2d 307, 309–15 (2d Cir.1982), unnecessary to resolve here. The exclusionary rule does not come into play until a search is found to have been illegal; the rule provides a sanction for an illegal search. The question here would be whether the arrest of David was legal because of what he told the police, even though they were able to question him only because they illegally entered the house where he lived.

**6.** Judge Posner's plurality opinion was joined by Bauer, Eschbach, and Pell, Circuit Judges. The remaining Circuit Judges concurred with Judge Posner's ruling that David Llaguno's 42–hour detention was unconstitutional, *Llaguno,* 763 F.2d at 1570 (opinion of Cummings, Chief Judge); *id.* (opinion of Coffey, Circuit Judge); *id.* at 1579–80 (opinion of Harlington Wood, Jr., Circuit Judge, joined by Cummings, Chief Judge, and Cudahy and Flaum, Circuit Judges); *id.* at 1580 (opinion of Cudahy, Circuit Judge), but without separate discussion of the plurality's treatment of the tainted fruits doctrine.

If he was coerced to respond to their questions, as he may very well have been, the information he gave could not be used to validate the arrest; but if he answered those questions voluntarily, it would be a jury question whether his decision to do so was an intervening cause which cut off the effect of the illegal entry.

*Llaguno*, 763 F.2d at 1568. By stating that the *legality* or *constitutionality* of Llaguno's arrest depended on whether the jury found that it was the "fruit" of the officers' unlawful entry, the plurality opinion appears to apply the exclusionary rule in a civil context despite its express disclaimer. Further, its language suggests that it applied the rule, or at least the principles of the rule, as a substantive standard measuring the constitutionality of Llaguno's arrest and initial detention, not as a judicially-created suppression remedy. Such an approach appears to conflict with the Supreme Court's characterization of the exclusionary rule's non-constitutional function in *Leon* and does not appear to be supported in the case law [7] (the plurality opinion in *Llaguno* did not offer citation or reference to authority for its approach).[8]

The plurality's articulation of the issue in terms of the constitutionality of conduct, however, may be seen as a semantic difficulty only, as its opinion clearly stated that it did not intend to apply the exclusionary rule to resolve the issue before it and the Court remanded the case for a trial on Llaguno's detention in regard to damages only, not liability. *Id.* at 1570. It is better to interpret the *Llaguno* Court's holding as an application of traditional proximate cause analysis: civil rights plaintiffs may recover damages for injuries suffered as a proximate result of defendants' constitutional violations.[9] Section 1983 incorporates common law tort principles of damages and causation, *Memphis Community School District v. Stachura*, 477 U.S. 299, 306, 308, 106 S.Ct. 2537, 2542, 2543, 91 L.Ed.2d 249 (1986); *Malley v. Briggs*, 475 U.S. at 344 n. 7, 106 S.Ct. at 1098 n. 7, including the concept of proximate cause, *Jones v. City of Chicago*, 856 F.2d 985, 992–94 (7th Cir.1988); *Hibma v. Odegaard*,

---

7. For an identical treatment of the issue, see 1 Wayne R. LaFave, *Search and Seizure*, 2nd ed., § 3.2(d), p. 586 (1987) (commenting that whether illegally obtained evidence may supply probable cause for a search or seizure depends on whether the evidence is "fruit of the poisonous tree.").

Prior to *Llaguno*, a panel of the Seventh Circuit resolved a similar probable cause for arrest issue differently. In *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336 (7th Cir.1985), the defendant police officers entered the § 1983 plaintiffs' camper without a warrant and arrested the plaintiffs after receiving incriminating answers to their questions. The majority held that whether the defendants had probable cause for the arrests depended solely on whether the plaintiffs' answers were coerced, without regard to whether they had not consented to the defendant officers' initial entry into the camper. *Id.* at 1346–47. Judge Posner in dissent suggested that, in addition to voluntariness, the legality of the plaintiffs' arrest depended on whether the defendant officers' initial entry was lawful. *Id.* at 1356–57 ("The problem [of identifying the suspects] disappeared if they [the plaintiffs] volunteered their identity to the police—provided the admission was not obtained through an unlawful entry."). Rather than anticipating the plurality opinion in *Llaguno*, however, Judge Posner may have assumed that an illegal entry, in the circumstances of that case, was inherently coercive. *See id.* at 1358. Also see *United States v. Gillespie*, 650 F.2d 127, 129 (7th Cir.1981) (*per*

*curiam*) (in excluding the defendant's custodial confession in this pre-*Leon* criminal prosecution, the court characterized his detention as "illegal" because the probable cause for his arrest was based on the tainted fruit of an unconstitutional search), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982).

8. Again, this Court did not have the benefit of the parties' advice on this issue and was therefore not in a position to undertake exhaustive research. As the discussion based on our limited research shows, the plaintiff's and *Llaguno*'s use of the exclusionary rule's fruits principle as a substantive constitutional standard does not appear to be supported by Fourth Amendment precedent. If they grounded their treatment on substantive due process principles independent of the Fourth Amendment, it must be remembered, first, that the Fourth Amendment encompasses Fourteenth Amendment protections, and, second, that the plaintiff did not prosecute this action on Fourteenth Amendment Due Process grounds and did not request instructions to that effect.

9. On *Llaguno*'s facts: David Llaguno could recover damages under § 1983 for injuries suffered during his initial detention if he could show that his arrest, or, more properly, the statements he made prior to his arrest, were the proximate result of the defendant officers' initial unconstitutional entry.

769 F.2d 1147, 1155–56 (7th Cir.1985); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1359 (7th Cir.1985) (opinion of Judge Posner). When a plaintiff seeks to recover damages for injuries suffered during successive steps of state action—*e.g.*, search, arrest, interrogation, detention, and trial—each stage of conduct must be separately judged by the constitutional standard applicable to the particular right violated, whether Fourth, Fifth, or Fourteenth Amendment. The exclusionary remedy does not operate to characterize all subsequent conduct "unconstitutional" simply because a previous step was defective.[10] However, a plaintiff who suffers a constitutional deprivation early-on may, under § 1983, recover for his later injuries, even during later constitutional stages in the process, if the injuries are reasonably foreseeable consequences of the earlier deprivation of rights. *Jones, supra; Hibma, supra; Cameo Convalescent Center, Inc. v. Senn*, 738 F.2d 836, 845–46 (7th Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir.1988); *Weber v. Village of Hanover Park*, 768 F.Supp. 630 (N.D.Ill.1991); *Horton v. Notorfrancesco*, Civ.A. No. 88–1962, Memorandum and Order, 1990 WL 112087, *7–8 (E.D.Penn. Aug. 1, 1990); *see Patrick v. Jasper County*, 901 F.2d 561 (7th Cir.1990). In this analysis, contrary to the plurality's suggestion in *Llaguno*, the operative standard is the tort principle of proximate cause, not the exclusionary rule's principle of taint and attenuation. The two are not identical. Because the taint-attenuation standard serves the deterrent purposes of the exclusionary rule, its effective limit is reached when the benefit of deterring misconduct is outweighed by the cost of losing probative evidence, *see* 4 LaFave § 11.4(a), p. 373, which may give the standard a narrower or broader reach than the proximate cause standard depending on the particular factual context and the interests at stake.

■■■■■ In the present case, therefore, the plaintiff's argument that his alleged consents were "invalid—worthless" as a matter of law merely because he contends that the weight of the evidence established the defendants' initial unlawful entries must be rejected. Furthermore, regardless of the correctness of the plaintiff's interpretation of the law, the Court clearly instructed the jury that the legality of the defendants' initial entries onto the plaintiff's property was but one factor which might be considered by them in determining the validity of his consent to the ensuing searches and seizures.[11]

10. Such an approach presents problems not addressed by the *Llaguno* plurality. In the not uncommon scenario where different government officials are independently responsible for different stages of the criminal process, a finding that the entire chain of events was tainted because of an earlier defective link raises questions of the actors' liability which are more properly analyzed under the rubric of proximate causation of damages rather than constitutionality of conduct. Would defendant officers who were responsible for a plaintiff's arrest, post-arrest interrogation, and detention, and who performed those functions constitutionally and in good faith, be liable for relative portions of the plaintiff's damages if it were later determined that other officers at the start of the chain, who had no further responsibility over the plaintiff, conducted an initial illegal search? Obviously, only the actual tortfeasors should be held responsible. Rather than analyzing such scenarios under an awkward "constructive unconstitutionality" approach, governed by taint-attenuation rules which were not developed for such applications, courts would do better to simply determine the unconstitutional conduct, identify the tortfeasors, and apply the extant rules of proximate cause to determine the extent of damages.

11. Instruction no. 6 read:

"The defendants contend that the plaintiff consented to the searches and seizures at issue in this case. If a person in lawful possession of a home or real estate freely and voluntarily invites or consents to a search or seizure, law enforcement officers may reasonably and lawfully conduct the search or seizure without a warrant to the extent of the consent so given. The defendants bear the burden of proving by a preponderance of the evidence that the plaintiff consented to the searches and seizures.

"You must determine, based on a consideration of the totality of the circumstances, (1) whether the plaintiff consented to the defendants' searches and/or seizures; (2) whether that consent was voluntarily given; (3) the scope, extent, or limits of the consent that was given; and (4) whether the defendants' searches and/or seizures exceeded that scope.

"The totality of the circumstances includes, *but is not limited to*, the following: the age of the plaintiff; his education, intelligence, and sophistication; his mental, emotional, and physical condition at the time; whether he was in custody;

The plaintiff did not object to the giving of this instruction and concedes in his brief on the present motion that it accurately stated the governing law. As previously noted, the standard for judging the constitutionality of a warrantless search and seizure pursuant to consent is whether that consent was freely and voluntarily given. The plaintiff's motion for a new trial does not argue that a finding by the jury that his consents were voluntary would have been against the weight of the evidence. Further, the jury was instructed, without objection, on the principle of proximate cause and the plaintiff's motion for a new trial does not contend that a jury finding that his damages weren't proximately caused by the defendants' unlawful entries would have been against the weight of the evidence.

### Conclusion.

The plaintiff's motion for a new trial on the grounds that the jury's verdicts are against the weight of the evidence is hereby **DENIED.**

the length and nature of the interrogation; whether he has been advised of his right to refuse consent; statements of authority to search or seize made by the defendants; and the nature of the defendants' requests and statements. *Should you find that the defendants violated the plaintiff's rights by initially entering onto his property without justification, you may consider that fact as one circumstance bearing on the voluntariness of the plaintiff's later consents, if any.*

"The test for voluntariness is an objective one. You must decide whether a reasonable person in the plaintiff's situation would have felt free to decline the defendants' requests or otherwise terminate the encounter, in light of all the circumstances surrounding the encounter. If you find that a reasonable person in the position of the plaintiff and in the circumstances at that time would not feel free to decline the defendants' requests or not at liberty to ignore the defendants' presence, then you must find that the plaintiff's consent, if any, was not voluntarily given.

"The permissible scope of a consent search is limited by the breadth of the actual consent given. The plaintiff's conduct, as well as his words, can be indicative of the scope of the consent given. Further, the plaintiff's words or conduct after the initial consent is given, and during the search and/or seizure, can be indicative of whether he clarified, withdrew, limited, or expanded the scope of his consent." (Second emphasis added).